## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DAMON WALKER,

     *Plaintiff,*

vs.

    Case No. 20-02049-EFM

ANSWER TOPEKA, INC.,

     *Defendant.*

## MEMORANDUM AND ORDER

Plaintiff Damon Walker brings three claims against Defendant Answer Topeka, Inc., ("Answer Topeka") alleging: (1) Defendant discriminated against him on the basis of sex, in violation of Title VII; (2) Defendant discriminated against him on the basis of race, in violation of 42 U.S.C. § 1981; and (3) Defendant terminated him and/or refused to give him additional hours as an act of retaliation, in violation of 42 U.S.C. § 1981. Before the Court is Defendant's Motion for Summary Judgment (Doc. 31). For the reasons outlined below, the Court grants Defendant's motion.

### I.     Factual and Procedural Background

Plaintiff, an African American man, began his most recent position with Defendant in August of 2018. Plaintiff previously worked for Defendant but was terminated in 2009 after an

incident in which Plaintiff directed profanity at his supervisor, Danielle Hull, stating that she "let these other b****** leave early all the time."[1]  Plaintiff was on the clock and in the presence of co-workers when he made this statement.  Defendant later re-hired Plaintiff for his current position as the full-time overnight operator.

During Plaintiff's employment at Answer Topeka, three main shifts were available to work: (1) the morning shift, which ran from 7:00 a.m.-3:00 p.m.; (2) the evening shift, which ran from 3:00p.m.-11:00p.m.; and (3) the overnight shift, which ran from 10:00 p.m.-7:00 a.m. Part-time employees worked shorter shifts depending on availability.  In accordance with Defendant's regular practice, employees could leave the evening shift one hour early, but only if the call volume was low.[2]

Plaintiff asserts that employees could always leave early without permission if calls were not busy.  However, review of Plaintiff's cited record evidence for this factual contention reveals a different situation.  Both Craig Woodbury, the owner of Answer Topeka, and Hull, Plaintiff's supervisor at all relevant times, stated in their depositions that employees needed permission to leave the evening shift early.  Hull further clarified that the only time employees did not need permission to leave was between 10:00 p.m. and 11:00 p.m., the last hour of the evening shift.[3]

To the contrary, employees could not abandon their shift during "primetime" hours, which Woodbury stated were from 5:00 p.m. to around 8:00 or 8:30 p.m.  Woodbury further stated he

---

[1] Doc. 32-1, at 10, Walker Depo. at 50:16-51:3.

[2] Plaintiff purported to dispute this fact in briefing, however, Plaintiff's reply only addressed other aspects of this policy and stated that this policy was not in writing.  Accordingly, Plaintiff did not effectively dispute that employees could leave the last hour of the evening shift if call volume was low.

[3] Plaintiff also cites Lewicki's testimony that suggests permission is not needed for employees to leave their shift early.  However, because Lewicki was not Plaintiff's supervisor, her unclear testimony which may suggest permission is not needed is irrelevant.

had terminated around ten people throughout the years for abandoning a shift during primetime hours.

Although there is no written policy regarding the specifics of this practice, both parties agree it was regularly enforced – in fact, Plaintiff himself left his scheduled shift early 32 times in a five-month period without any disciplinary action.

On February 9, 2019, Joyce Rivera, a Caucasian female coworker, told Plaintiff to "kiss her mother****** a**."[4]  Rivera made this comment after clocking out of her evening shift.[5] Plaintiff complained of this incident to his supervisor Hull, who in turn submitted the complaint to Lori Lewicki, Answer Topeka's office manager. Lewicki verbally counseled Rivera about this incident.[6]

On July 7, 2019, Plaintiff was scheduled to work the overnight shift. Another female Caucasian co-worker, Megan Storm, was scheduled to work the evening shift.  Storm left her shift 18 minutes early, leaving Plaintiff to answer calls on his own for those 18 minutes.[7]  Although the parties dispute whether Storm was verbally counseled or not, the parties agree Answer Topeka changed its policy in response to Plaintiff's complaints about this incident and employees could

---

[4] Doc. 32-1, at 128.

[5] Plaintiff also claims Rivera left her shift early this night, but he submits no evidence to support this claim. Rivera was scheduled for the evening shift on February 9, from 3:00 p.m.-10:00 p.m.  Rivera clocked out at 10:01 p.m.  According to Plaintiff, Rivera was covering Megan Storm's shift, which he alleges was from 3:00 p.m.-11:00 p.m.  This assertion is not supported by record evidence – Megan Storm was scheduled to work 11:00 a.m.-7:00 p.m. on February 9, not 3:00 p.m. to 11:00 p.m.  As such, although not material to the Court's decision, no record evidence supports Plaintiff's assertion that Rivera left her shift early on February 9.

[6] Plaintiff purports to dispute this fact in briefing, however, his dispute addresses only that Lewicki did not speak to Plaintiff after this complaint and does not actually dispute that Lewicki verbally counseled Rivera.

[7] The parties dispute whether call volume was high or low when Storm left early.  Plaintiff claims the call level was high and that Defendant never checked the records to see for themselves.  Defendant testified at its deposition, however, that it had checked call volume that night, and it was "soft," meaning one person could handle the calls.  Whether the call volume was high on this night is immaterial to the Court's decision, however.

no longer leave the evening shift early.  Defendant also began taking steps to separate Plaintiff and Storm due to the escalating tension between the parties.  Specifically, Defendant did not schedule Plaintiff and Storm on the same shift, and Defendant began releasing Storm from her shift early so the parties would not cross paths when Plaintiff arrived for his shift.

Shortly after the July incident with Storm, Plaintiff voiced his frustrations to Hull via text, stating he believed he was being treated differently than Storm and that and he was being painted as intimidating and scary because he was black.  In response, Hull told Plaintiff "as far as how you're feeling you have not once came and spoke to Lori. . . Lamont is black but yet no one has a problem with him so stop throwing the race card around."[8]

After the July incident with Storm, Plaintiff requested a meeting with Lewicki and Woodbury to discuss his concerns.  This meeting took place at some point in July.[9]

In August of 2019, Plaintiff began attending school full-time online.  Roughly one month after starting school, Plaintiff emailed Lewicki and informed her that he needed to stop working overnights due to health and family issues.  Approximately one month later, Plaintiff again emailed Lewicki, this time advising her that "it may be best to drop me down to part time."[10]  Once dropped down to part-time, Plaintiff became displeased with the amount of hours he was receiving and requested more hours from Lewicki multiple times.  Plaintiff never received any additional hours.

---

[8] Doc. 32-1, at 105.

[9] The parties dispute the subject matter discussed in this meeting. Plaintiff claims he complained that he was being held to a different standard than his white co-workers. Lewicki testified, however, that Plaintiff never mentioned he felt he was being treated differently than his coworkers, but rather raised concerns with the previous instance with Rivera, another incident where Plaintiff was previously fired from Answer Topeka and the locks were changed on him, and an unrelated instance where Plaintiff was arrested at his doctor's office.  Specifics of what was discussed is immaterial to the Court's decision because it speaks to whether Plaintiff engaged in protected opposition to discrimination, which the parties do not dispute.

[10] Doc. 32-1, at 63.

On November 18, 2019, Plaintiff was scheduled to work from 4:00 p.m. to 9:00 p.m.  After arriving at work, Plaintiff was frustrated with the upcoming schedule and texted Hull, "I'm so mad I'm out of here this week if I can another job. I almost want to walk out now."[11]  Shortly thereafter, Plaintiff again messaged Hull and said, "[a]ctually I'm done I'm leaving tonight and I'm not returning I cant do this any more" and "I left I done."[12]  Plaintiff then told Marcia Banks, the lead on-site supervisor, "I'm done with this sh**," "I'm done with this place,"[13] and left his shift at 7:18 p.m., one hour and 42 minutes before the end of his scheduled shift.

The following morning, Plaintiff texted Hull that he was going to "stop by the office and make sure [the owner of Answer Topeka] will give me a good referral"[14] and that he was "willing to come back but I need hours."[15]  Plaintiff then went into the office to try and speak to Lewicki, but she asked him to leave.

Plaintiff now asserts Title VII sex discrimination, § 1981 race discrimination, and § 1981 retaliation claims against Defendant. Defendant moves for summary judgment on all claims.

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[16]  A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered

---

[11] Doc. 33-1, at 15, Walker Depo. at 101:14-18.

[12] Doc. 32-1, at 20, Walker Depo. at 63:18-23.

[13] Doc. 32-1, at 23, Walker Depo. at 72:14-19.

[14] Doc. 32-1, at 49, Walker Depo. at 191:11-16.

[15] Doc. 32-1, at 35, Walker Depo. at 107:12-15.

[16] Fed. R. Civ. P. 56(a).

evidence permits a reasonable jury to decide the issue in either party's favor.[17]   The movant bears

the initial burden of proof and must show the lack of evidence on an essential element of the

claim.[18]   The nonmovant must then bring forth specific facts showing a genuine issue for trial.[19]

These facts must be clearly identified through affidavits, deposition transcripts, or incorporated

exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[20]   The

court views all evidence and reasonable inferences in the light most favorable to the non-moving

party.[21]

## III.    Analysis

### A.    Title VII Sex Discrimination and Harassment

Plaintiff alleges Defendant discriminated against him on the basis of sex in violation of

Title VII of the Civil Rights Act of 1964.   To establish discrimination under Title VII, Plaintiff

must satisfy the requirements outlined by the Supreme Court in *McDonnell Douglas Corp. v.*

*Green*.[22]   Under *McDonnell Douglas*, Plaintiff must first establish a prima facie case of

discrimination by showing that (1) he is a member of a protected class, (2) he was qualified for the

position at issue, (3) he suffered adverse employment action, and (4) this action was not done to

similarly situated employees that are not members of that protected class.[23]

---

[17] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citation omitted).

[18] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[19] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

[20] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[21] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

[22] 411 U.S. 792 (1973).

[23] *See Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006).

Once Plaintiff has established his prima facie case of discrimination, the burden shifts to Defendant "to articulate a nondiscriminatory reason for the adverse employment action."[24]  If Defendant satisfies this burden, Plaintiff must then show that Defendant's articulated reason for the adverse employment action is pretextual.[25]

1.     *Reverse Discrimination*

Plaintiff alleges that Defendant terminated his employment based on his sex. Because Plaintiff is a male, his Title VII claim is one of reverse discrimination, i.e., discrimination against a member of a class not historically subjected to discrimination.  A plaintiff claiming reverse discrimination is not automatically entitled to rely on the *McDonnell Douglas* burden-shifting framework just because he alleges that he suffered adverse employment action when equally qualified members of other classes did not.[26]  A plaintiff may satisfy his prima facie case of discrimination, however, by producing facts that support a reasonable inference that "but-for" the plaintiff's status he would not have suffered the alleged adverse employment action.[27] Alternatively, a plaintiff claiming reverse discrimination can still rely on the *McDonnell Douglas* burden-shifting framework if he alleges background circumstances that support an inference that the defendant is one of those "unusual employers who discriminates against the majority" in addition to claiming to be a member of a protected class.[28]

---

[24] *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir. 2001) (alteration and citation omitted); *see also McDonnell Douglas*, 411 U.S. at 802.

[25] *Id*. (citation omitted).

[26] *Notari v. Denver Water Dep't*, 971 F.2d 585, 589 (10th Cir.1992).

[27] *Id*. at 590.

[28] *Argo*, 452 F.3d at 1201 (citing *Notari*, 971 F.2d at 589).

As an initial matter, Plaintiff first argues this heightened level of scrutiny does not apply to him because, as an African American man, Plaintiff cannot reasonably be part of a historically favored group. Plaintiff fails to cite any cases addressing this argument, and the Court has failed to find any supporting the same. In any event, Plaintiff's Title VII claim involves only sex discrimination, and as a male, Plaintiff must meet the requirements for reverse discrimination noted above.

Plaintiff has failed to present evidence that would support a reasonable inference that but-for his status as a male, he would not have suffered the alleged adverse employment action. Plaintiff also fails to allege background circumstances that support an inference that Defendant is one of those unusual employers who discriminate against the majority. In his support of his argument, Plaintiff alleges Defendant: (1) ignored Plaintiff's complaints about Rivera's behavior; (2) ignored allegations of Storm's inappropriate behavior towards Plaintiff and failed to investigate; (3) failed to discipline Rivera for her conduct; (4) failed to discipline Storm for her behavior; (5) terminated Plaintiff for engaging in similar, or even lesser, conduct than Rivera and Storm; and (6) had a habit of condoning female behavior, while acting hypersensitive to the behavior of males.

First, the undisputed facts show Defendant did not ignore Plaintiff's complaint about Rivera, but that Rivera was verbally counseled as a consequence of her actions. Second, although there is a factual dispute regarding whether Storm was verbally counseled, that dispute is not material because Defendant did not ignore Plaintiff's complaint about Storm – to the contrary, it completely changing its existing policies in response to Plaintiff's complaint.

Finally, Plaintiff's claim that he was terminated for engaging in similar, or even lesser, conduct than Rivera and Storm and that Defendant condoned females' behavior but were

hypersensitive to male's acts is not supported by the undisputed facts. Plaintiff's actions were not similar to either Rivera or Storm. Plaintiff directed profanity at his supervisor, abandoned a shift during primetime hours, and unambiguously informed multiple supervisors that he would not be returning. In contrast, Rivera directed profanity at a co-worker after clocking out of her shift, and Storm left her shift 18 minutes early during the 10:00 p.m.-11:00 p.m. time slot, which was regularly allowed and outside of primetime hours. The undisputed facts also show that Defendant did not condone Rivera and Storm's acts, but rather Rivera was verbally counseled, and Defendant changed its policy after the incident between Storm and Plaintiff. Plaintiff also fails to provide any evidence of other instances where Defendant was "hypersensitive" to other male's acts. As such, Plaintiff has to present evidence that would support a reasonable inference that either: (1) but-for his status as a male, he would not have suffered the alleged adverse employment action, or (2) Defendant is one of those unusual employers who discriminate against the majority. Plaintiff's Title VII claim therefore fails.

### 2.    *Adverse Employment Action*

Even if Plaintiff could satisfy the heightened reverse discrimination burden, Plaintiff fails to show he suffered any adverse employment action. The Tenth Circuit has consistently held that only acts causing "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or . . . a significant change in benefits" are considered adverse employment actions.[29] Whether an action is sufficiently adverse is made on a case-by-case basis, "examining the unique factors relevant to the situation at hand."[30]

---

[29] *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1040 (10th Cir. 2011) (citations omitted).

[30] *Id*. (citation omitted).

Plaintiff alleges that Defendant terminated his employment for engaging in similar conduct as white, female co-workers who were not fired.  Even viewing the facts in the light most favorable to Plaintiff, the record clearly shows that Plaintiff was not terminated, but rather, Plaintiff voluntarily resigned from his position at Answer Topeka.  Minutes before abandoning his shift, Plaintiff texted his off-site supervisor that he was "done" and was "not returning."  He then told his on-site supervisor that he was "done with this sh**" and "done with this place" before leaving his shift nearly two hours early during primetime hours.  Although Answer Topeka had a policy allowing employees to leave the evening shift early with permission, Plaintiff failed to receive such permission.  He also left his shift while directing profanity at his supervisor and clearly indicated multiple times that he would not be returning.

Plaintiff also made multiple statements the following day that show he had voluntarily resigned his position.  First, Plaintiff told Hull that he was hoping Woodbury, the owner of Answer Topeka, would give him a good reference, seemingly for a new job.  Plaintiff also told Hull that he was "willing to come back" but he would need more hours.  Together these statements show that at that time, even Plaintiff was treating the prior night's events as a resignation.  As such, Plaintiff cannot establish an adverse employment action and summary judgment is therefore appropriate on his Title VII claim.

### 3.    *Legitimate, Nondiscriminatory Reason*

Even if this Court were to find Plaintiff suffered an adverse employment action, Defendant has established a legitimate, nondiscriminatory reason for its actions.  To satisfy this burden, Defendant need only explain its actions against Plaintiff in terms that are "not facially prohibited

by Title VII."[31]  Defendant claims that, in light of Plaintiff abandoning his shift almost two hours before it ended during primetime hours and informing multiple supervisors that he was leaving and not coming back, it believed Plaintiff had resigned.  The Court finds this is a valid, nondiscriminatory reason for Defendant's actions, and under *McDonnell Douglass*, the burden now shifts to Plaintiff to present evidence that Defendant's proffered reason is pretextual, i.e. unworthy of belief. [32]

    *4.*    *Pretext*

A challenge of pretext "requires a court to look at the facts as they appear to the person making the decision to terminate, not the aggrieved employee."[33]  The relevant inquiry for the Court, then, is "not whether the employer's proffered reasons were wise, fair, or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs."[34]

Reviewing the facts as they appeared to Defendant at the time of Plaintiff's termination, Plaintiff has failed to show that Defendant's acts were pretextual.  Plaintiff unambiguously informed not one, but two of his supervisors that he was leaving his shift and was not coming back.  Considering these statements, Defendant had a valid, good faith belief that Plaintiff had resigned.

Plaintiff argues that Defendant's acts were pretextual because other similarly situated co-workers who engaged in "similar, or worse conduct" were not terminated.  Pretext can be established by showing that the employer "treated the plaintiff differently from other similarly-

---

[31] *Jones v. Denver Post Corp.*, 203 F.3d 748, 757 (10th Cir. 2000), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

[32] *Gearhart v. Sears, Roebuck & Co.*, 27 F. Supp. 2d 1263, 1273 (D. Kan. 1998) (citing *Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995)).

[33] *Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007) (citations omitted).

[34] *Sarkar v. McCallin*, 636 F.3d 572, 576 (10th Cir. 2011) (quoting *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 924–25 (10th Cir. 2004)).

situated employees who violated work rules of comparable seriousness."[35]   Plaintiff alleges two separate theories for differential treatment – first, that Storm, a Caucasian female, left her shift early without being terminated; and second, that other female employees missed shifts and were not terminated.  Both theories fail as the undisputed facts show Plaintiff was not similarly situated to those coworkers and Plaintiff enjoyed the same benefits.

First, Plaintiff argues that Storm abandoned her shift on July 7 but was not terminated, and that he was terminated for doing the same thing.  This argument fails.  Storm left her shift 18 minutes early during the 10:00 p.m. to 11:00 p.m. time period where employees regularly left early and did not need permission to do so.  Storm also did not indicate to anyone that she would not be returning.  This is in strong contrast to Plaintiff abandoning his shift almost two hours early during primetime hours, directing profanity at his supervisor, and telling multiple supervisors that he would not be returning.  The parties' dispute over whether call volume was high when Storm left is irrelevant – even if call volume was high, Storm did not leave during primetime hours, but rather left when permission was not needed, she did not direct profanity at a supervisor, nor did she express any desire to be "done with" Answer Topeka and never return.

Finally, Plaintiff argues that two other female employees missed scheduled shifts but were not terminated, and another female employee missed shifts and was only terminated after the third missed shift.  This argument also fails.  Missing a shift, although a violation of company policy, is not similar to Defendant's act of abandoning a shift almost two hours early during primetime hours, directing profanity at his supervisor, and informing multiple supervisors that he would not be returning.  Further, it should be noted that Plaintiff also missed seven scheduled shifts from July

---

[35] *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007) (citing *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)) (alteration omitted).

through November 2019 with no disciplinary action.[36]  Plaintiff also had a no-call/no-show shift back in 2009 but was not terminated.[37]  As such, Plaintiff has failed to show that Defendant's valid, nondiscriminatory reason for terminating his employment was pretextual.  Summary judgment on Plaintiff's Title VII sex discrimination claim is therefore appropriate.

## B.     42 U.S.C. § 1981 Racial Discrimination

Plaintiff next argues Defendant discriminated against him on the basis of race, in violation of 42 U.S.C. § 1981.  Courts apply the same *McDonnell Douglas* framework used for Title VII cases to 42 U.S.C. § 1981 discrimination cases.[38]  Accordingly, Plaintiff must show that (1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he suffered adverse employment action, and (4) this action was not done to similarly situated employees that are not members of that protected class.[39]

Plaintiff has satisfied the first two elements of his prima facie case because Plaintiff, as an African American, is a member of a protected class, and the parties do not dispute he was qualified for the position at issue.  Plaintiff's race discrimination claim still fails, however, for the same reasons as his Title VII claim. Plaintiff did not suffer any adverse employment action because he voluntarily resigned, as evidenced by his actions on November 18.  Even if Plaintiff did suffer an adverse employment action, Defendant had a legitimate, nondiscriminatory reason for terminating Plaintiff, and Plaintiff fails to show that Defendant's proffered reason is pretextual.  As such,

---

[36] Doc. 32-1, at 43, Walker Depo. at 168:1-6.

[37] Doc 32-1, at 58.

[38] *Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir. 1999).

[39] *See Argo*, 452 F.3d at 1201.

Plaintiff has failed to show any factual dispute exists and his § 1981 race discrimination claim does not survive summary judgment.

**C.    42 U.S.C. § 1981 Retaliation**

Finally, Plaintiff claims Defendant terminated him as an act of retaliatory discharge in violation of 42 U.S.C. § 1981.  A retaliation claim under 42 U.S.C. § 1981 requires that (1) the plaintiff engaged in protected opposition to discrimination, (2) he would have found the challenged action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action.[40]

Here, Defendant does not dispute that there is a genuine dispute of fact as to whether the text message exchange between Hull and Plaintiff, wherein Plaintiff complained to his supervisor that he was being treated differently than his coworkers because he was black, amounted to protected opposition to discrimination.  As such, the Court finds that Plaintiff has sufficiently shown a genuine factual dispute as to the first element of his § 1981 retaliation claim.

Plaintiff fails, however, to establish the remaining elements.  First, to the extent Plaintiff argues he was terminated as an act of retaliatory discharge, his claim fails for the same reasons as his Title VII and § 1981 discrimination claims – Plaintiff voluntarily resigned, as evidenced by his actions on November 18.

Plaintiff also alleges that his "failure to receive additional hours, despite repeated requests to Ms. Hull and Ms. Lewicki" constituted an adverse employment action.[41]  This argument also fails.  As noted above, only acts that cause "significant change in employment status, such as

---

[40] *Argo*, 452 F.3d at 1202 (citations omitted).

[41] Plaintiff only alleges this adverse employment action in relation to his § 1981 retaliation claim, not his Title VII or § 1981 discrimination claim.

hiring, firing, failing to promote, reassignment with significantly different responsibilities, or . . . caus[e] a significant change in benefits" are considered adverse employment actions.[42] Alternatively, "a mere inconvenience or an alteration of job responsibilities" does not constitute an adverse employment action.[43]

The undisputed facts show that Plaintiff's dissatisfaction with his hours was a consequence of his own personal choices, not any adverse employment action.  Plaintiff was hired for the full-time overnight operator position.  After beginning college full-time online, Plaintiff requested to switch to daytime shifts due to health and family issues, which Defendant accommodated.  Plaintiff argues that he was then forced to go part-time because of the lack of shifts available during the day, specifically because Plaintiff and Storm could not work together due to their tumultuous relationship.  This argument is unpersuasive – the undisputed fact remains that Plaintiff elected to go part-time.  Notably, any difficulty Plaintiff had in finding day shifts that he could work was due in large part to his own decision to move to day shifts, as well as his inability to get along with Storm, both of which Defendant accommodated.

After switching to part-time, Plaintiff was scheduled for an average of approximately 19 hours per week.[44]  Plaintiff also claims other part-time coworkers, namely Chelsea Jones, a Caucasian female, were scheduled more than 20 hours per week.  In support of this argument, Plaintiff presents one schedule for the weeks beginning November 18 and November 25, in which Jones, a Caucasian female, was scheduled for 22 hours and 25 hours, respectively.  But Plaintiff

---

[42] *E.E.O.C.,* 644 F.3d at 1040 (citations omitted).

[43] *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998).

[44] Plaintiff requested to go part-time on October 8 of 2019.  The following seven weeks he was scheduled for 18, 18, 23, 9, 18, 25, and 21 hours, respectively.  This results in an average of 18.85 hours per week, which the Court rounds up to 19.

was also scheduled for 25 hours during the week of November 18 and was scheduled for 21 hours during the week of November 25.[45]  As such, evidence of one other coworker being scheduled more than 20 hours twice, when Plaintiff enjoyed the same benefits, does not establish dissimilar treatment.

Further, Plaintiff fails to cite any cases supporting his argument that Defendant's failure to increase his hours after he asked to go part-time constitutes an adverse employment action, and the Court has failed to find any cases supporting the same.  To the contrary, sister courts in the Tenth Circuit have rejected similar arguments.[46]  The Court agrees with others within the Tenth Circuit and concludes Plaintiff has not established the second element of his claim. As such, his § 1981 retaliation claim fails.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 31) is **GRANTED.**

**IT IS SO ORDERED.**

Dated this 15th day of June, 2021.

This case is closed.


ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[45] *See* Doc. 33-15, at 2.

[46] *See Aluru v. Anesthesia Consultants,* 176 F. Supp. 3d 1116, 1126 (D. Colo. 2016) ("Generally, without more, scheduling disputes rarely qualify as adverse employment action") (citations omitted); *see also Calvin v. SMG,* 2014 WL 321170, at 7 (D. Colo. 2014) ("a scheduling dispute, without evidence of a material change in responsibilities or employment status, is not an adverse employment action").